Good morning. Welcome to the 2nd Division of the 1st District Appellate Court. Would the attorneys who are going to argue this morning please approach the bench. Identify yourselves for the record and indicate to the court how much time you would like for your arguments. Good morning, Your Honors. My name is Sari London, Assistant State's Attorney. Here on behalf of the people of Illinois, I would be requesting 15 minutes and then 5 minutes for rebuttal. Thank you. Ellen Ackerman for the appellee. Same time would be fine, Your Honor. Good morning. Mr. Ackerman, please proceed. I'm sorry, I said it. Cindy Giacchetti, she's up not to argue this morning. Can we talk her into it? I tried. All right, Mr. Ackerman, please proceed. Thank you. Oh, I'm sorry, Steve. Sorry, Your Honor. So off and you're second. Yes, that is correct. Good morning again, Your Honors. May it please the Court. My name is Sari London, Assistant State's Attorney here on behalf of the people of the State of Illinois, the appellants in this case. Despite the uncontroverted facts, the defendant in this case was a 51-year-old man, highly educated chemical engineer, agreed the day before the interview to come and talk to the police at the police station. He agreed to drive to South Barrington Police Station, where he also agreed to be driven with Detective Keplinger to Hoffman Estates, where the defendant sat in the front seat of the car, was never handcuffed, the car was unlocked, and then he was put, when they arrived at the station at Hoffman Estates, he remained alone in the lobby until he was greeted by the agents, who he agreed to talk to. Despite the fact that the defendant also did not testify, and therefore presented no evidence that he did not feel free to leave, and did not contradict the uncontroverted evidence that he remained free to leave, never asked to stop the interview or leave the station, and agreed to return the next day after the interview was done and he returned to go home. Despite all these uncontroverted facts, the trial court held the defendant was in custody immediately upon leaving South Barrington Police Station with the detective at 9.30 in the morning on March 6, 2000. This finding is erroneous as a matter of law and not in keeping with the decisions of the U.S. Supreme Court, Illinois Supreme Court, and this court, which all upheld that defendants are not under arrest or seized within the meaning of the Fourth Amendment when a volunteer accompanies an officer to the police station for an interview. When the totality of the circumstances and the uncontroverted evidence of record are reviewed here under the test which must be applied, which is a reasonable person, innocent of a crime, would believe that they were under arrest or not free to leave. Now applying this standard to the circumstances of this case, this case is more compelling than most of the cases which have held that the defendant has voluntarily accompanied the police to the police station and that accompaniment for questioning remained as such throughout the interview. In this case, the defendant agreed the day before to come to the station and speak to the police. That being said, the defendant had plenty of time where he could have hired an attorney. He could have made arrangements to have a family member or a friend accompany him to the station. He could have changed his mind and not come. But instead, the defendant agreed to come. He arrived at the station and chose to come by himself. When the defendant came to the station, he wasn't presented by a gathering of officers. There was just one officer that drove him to the police station. He was interviewed the entire day by just two officers. The judge said that the agents were on either side of him at the interrogation. Is there any evidence of that? Absolutely not, Your Honor. The only evidence of record is that there were two officers who the defendant agreed to speak to during the interview, which was Agents Zima and Tenza. There's no indication that they were hovering over him. They did testify that the interview remained conversational the entire time and that they did not pressure the defendant. We also know that the defendant was not handcuffed. The interview room remained unlocked the entire time. Several breaks were taken. The defendant was provided with food. And at no point in time, the evidence is very clear on this, did the defendant ask to stop the interview or ask to leave the station? Officer Tenza and Officer Keplinger testified very clearly that the defendant remained free to leave the entire day. Counsel, I'm somewhat troubled by the length of the interview, from 9.30 a.m. until 10.30 in the evening. That's just troubling to me. Well, Your Honor, length of time has been held by this court and the Illinois Supreme Court alone is not sufficient to transform a voluntary accompaniment to the police station for an interview to an illegal detention. And in this case, if you take the appropriate standard, which is a reasonable person innocent of a crime, it is reasonable that the defendant was willing to continue to cooperate. Because the defendant, as a reasonable person innocent of a crime, would have wanted to cooperate with the police to have the investigation completed so that any concerns that they had of defendant's involvement would have been satisfied and finished and that he could move on. That is completely reasonable. And again, the time length, which in fact the trial court, when it determined that it is unreasonable to believe that the defendant would have stayed for 14 hours, believing that he was free to leave, was an indication that the trial court didn't apply the appropriate standard in this case. He wasn't applying the reasonable person innocent of a crime standard. And in fact, the trial court's findings in many instances made assumptions that as if defendant had testified. And the defendant did not testify in this case. We have absolutely no evidence that defendant did not feel free to leave. And we absolutely have uncontroverted evidence that he never asked to leave or stop the interview. In fact, the concrete evidence shows at the end of the interview, before defendant went home at the end of the day, he agreed to return to the station. And in fact, defendant did return to the station. And at that time, he chose not to continue the interview. And that was it. He was allowed to leave the station. Again, he was free to leave. But what the defendant harps on a lot is the fact that apparently no notes were taken. You said 14 hours. It's a long time. And it's usual practice, isn't it, to take notes? And not one note? Your Honor, there's absolutely no evidence that there was departmental practice or a statute requiring the agents to take notes during the interview. And in fact, defendant's argument regarding the implausibility of Agent Hens' testimony with regard to not taking notes or possibly not remembering things, is an invitation asking this court, in fact, to make credibility findings that the trial court simply didn't make. And that is not the role of the reviewing court. The trial court, while they ruled against us, did not make a finding that he did not find the state's witnesses not credible. Also did not discuss any point about being troubled by the fact that no notes were taken. And in fact, Agent Hensel was quite honest about that. She said, we didn't take notes. And the fact that she didn't remember many things is this was 14 years later. Right, right. I mean, that shows how truthful her testimony was. She could have embellished, but she didn't. She didn't remember. It was 14 years later. Another point which I would like to point out is while defendant voluntarily accompanied the officers to the police station, and we maintain he voluntarily remained at the police station for the interview, while this was not a seizure or a custodial interrogation, defendant read his Miranda rights at 1230 after making inconsistent statements. Defendant had been at the station for three hours. That was with a bathroom break and a lunch break. And at the point in which the defendant made inconsistent statements, not a confession, but inconsistent statements, the officers, to ensure that his rights were protected, gave defendant his Miranda rights. He said he understood. He signed a waiver and agreed to continue the conversation. Here is another example of how improper the trial court's order is. If you look to the trial court's determination of lack of probable cause, when the court made, in response to the people's alternative argument that even if at any point the detention had transformed into a seizure, that there was probable cause to arrest, the trial court simply made determinations that did not consider the totality of the circumstances, which you must, the totality of the circumstances known to the officers at the time, which would make a reasonable, cautious person believe that a crime has been committed and by the person arrested. The court ignored the totality of the circumstances and, quite frankly, considered irrelevant factors and points in determining that there was no probable cause. With regard to the totality of the circumstances, the people maintained that while the police were not hasting to arrest the defendant, they could have. There was probable cause. What was known to them at the time was the defendant was the only one home who could have possibly committed this murder. Through the police investigation, they spoke to two of the friends of Cynthia who had detailed conversations that they had with Cynthia about the marital problems that Cynthia and the defendant had. You're saying they could have arrested him at that time? Absolutely. Well, they waited a long time. That doesn't, they may have. That might show that if they had the goods, they would have because, as you said, he was the only one there. It's up to the child. Well, there's more than just that he was the only one there. It was the conversation with the friends which would show she was afraid of him, he had threatened her. They still waited, what, 13 years? That isn't really part of the analysis of whether or not at that time there was probable cause. They may have chose not to have arrested him or charged him at that time. However, that doesn't mean it wasn't. Maybe the medical testimony was such that it was very, there was some evidence that the autopsy did not show that definitively whether she died from drowning or not. I mean, it was unclear. Well, what the autopsy shows is that at that time, which was right when she had died, at the very beginning of the police investigation, that the classification of the manner of death was undetermined. However, classifying it as undetermined doesn't mean that it's not a homicide and also doesn't mean it's an accident. All it means is at that point in time, the medical examiner was prepared to make that serious and important distinction. However, it does not diminish the opinion of the medical examiner, which was the internal and external injuries of Cynthia all were inconsistent with an accidental drowning and that the nature of her death was very suspicious. That adds to the probable cause. I mean, there wasn't even enough for a warrant to be issued to look at his house. They had to get a voluntary consent. Well, Your Honors, we would maintain that whether or not a search warrant of the house was declined is actually irrelevant to the finding of whether there was probable cause to arrest. Those two standards are completely different. Probable cause for a search warrant is based on the circumstances. There's probable cause that there will be evidence found in the home as opposed to probable cause to arrest, which is based on the totality of the circumstances a crime has been committed and the defendant committed it. There needs to be an access for a search warrant to search the house. And in this case, if you look at the search warrant and the complaint to search that was written by the officers, they did detail the information they had. And that information would have been sufficient for probable cause to arrest. However, what the search warrant and the complaint to search warrant does not do is it does not provide that the information that the officers had gives probable cause they will find evidence of the crime in the house or the items that they wish to search and seize. And furthermore, we would maintain that these were opinions by assistant state attorneys whether to issue or not issue a search warrant. It doesn't mean that that wasn't a finding by a court, and it also doesn't mean that there wasn't probable cause to arrest. We would maintain that the trial court who overly emphasized that detail in determining whether or not there was probable cause is another example of the impropriety of his findings. We would maintain that based on the fact that the trial court was erroneous as a matter of law from the very start, his finding that the defendant was seized and under arrest from the moment he left South Barrington Police Station is so wrong as a matter of law that this court can reverse on that basis alone. We, of course, maintain that the entirety of his judgment is incorrect. He applied incorrect standards, and the uncontroverted evidence establishes that defendant agreed the day before to come to the police station and talk to the police officers. There's nothing in the record to indicate at some point he wished to end the interview and go home. He remained at the station voluntarily to cooperate with the police. This was reasonable to have the investigation. We don't know because it's not in the notes. It's not in the report that was taken afterwards. Nobody testified to it. So the only thing we know is what's in that report. Well, no, we know what the officers testified. They didn't testify any different than what was in the report, and they were careful. Did Judge Karahelius make any credibility findings? He never said that the officers were not credible. What he did was he applied the evidence and the facts that were gleaned from their testimony and made his own assumptions, which he's entitled to, but we would say that they were incorrect as a matter of law. For example, he said that... So do you take from that that he accepted their testimony and drew a different conclusion from what he accepted? Yes. He accepted their testimony and never finding them not credible, but finding nevertheless in spite of all the testimony... So in other words, accepting what they said, Correct. I mean, he made a couple errors in things that he said. He found that the defendant went in the squad car, and it was an undercover police car, which was unlawful. Small different details. He gleaned from the testimony that it was accusatory  He didn't say that the interview remained conversational. And the defendant was not pressured. So what would you characterize that as? If the policeman says it was a conversational meeting and the judge says it was a confrontational meeting, what is that? Is that a credibility determination or a conclusion that is against the manifest way of the evidence? Or is that a de novo analysis that we would do saying what? I think with regard to that, while the trial court is pursuant to the standard review entitled to deference, we would say that certainly some of those findings were against the manifest way of the evidence. Why? Because the trial court's findings that... Because there was no evidence to contradict. Exactly. And because he assumed because the defendant stayed at the station for questioning and there was discussion about the possibility of whether or not the defendant was involved in his wife's death, that it was accusatory. But really the officers testified that from the moment that the defendant had given inconsistent statements, he was right as Miranda writes, and at no point was there screaming. They didn't pressure the defendant. It was an interview and it was a discussion. And the defendant never sought to end the interview, never asked to leave, and even agreed to come back. So all of these factors, all of these uncontroverted facts, taken where the trial court never said that he didn't believe the officers, he nevertheless, as a matter of law, erroneously held, defended from the moment he left South Barrington Police Station, was seized and in custody and under arrest. And we would say that's erroneous and not in keeping with any of the cases from the United States Supreme Court, this court, the United States Supreme Court. We would ask for that reason alone and many other reasons showing that his complete judgment is incorrect, for you to reverse the findings, the granting of the motion to suppress, and to remand this case for further proceedings. Thank you. Mr. Ackerman. Court, please. Apparently, appellate arguments are supposed to be conversational, and accordingly I will not raise my voice or shout, although I'd like to. Concerning credibility, if the circuit court and the circuit court findings are entitled to great deference, the circuit court disagrees with the state's position, not collaterally but directly, that's an implied, inferred, or implicit method that the circuit court can use of undermining the credibility of the state's witness or the state's position based on their testimony. The state would have this court believe that seasoned, experienced Illinois State police officers who are brought in specially to extract a confession from a defendant would take no notes for 13 odd hours. They would assume that there is no question first, warn later situation, and although the circuit court did not mention credibility directly, or question first, warn later, which is clearly Illinois and U.S. Supreme Court law, that is what happened here. And the circuit court in its 30-page decision and order sets forth its reasons for rejecting the state's position that everything the state sought was wrong. Now, how did the defendant get to the police station? Well, of course, he drove. Except he was told to leave his car and go to another police station so that he had no way to get back other than a police vehicle. No, the court found that inherently coercive. Correct. But you are in an inherently coercive atmosphere for 13 hours. You're not told you're free to leave. But the judge, just at the get-go, just beginning in the car. Correct. And I'm in my car in the front seat and being driven to another location, isolated from the car, the judge said that was coercive. Let us assume for a moment, and Justice Hyman, I'll try to answer your question. Let's assume that the custodial status didn't start until 10 a.m. rather than 9.30. He was driven in the undercover car to the Hoffman Estates Police Department at 9.35, deposited in that police station, ostensibly because that's the only place they had an interview room, which, whether the circuit court believed that or not, I don't know, but the court found it to be strange. I'll put it that way. In all events, let us suppose, for example, that he was in custody once he got to the Hoffman Estates Police Department, which was 9.45 a.m. It doesn't make a difference here because that way he's still in their custody. And let me go backwards. This was a choreographed, a very carefully choreographed scene, because the day before the former chief of police, the retired South Barrington chief, testified during the suppression hearings that on March 5th, the day before, they met for hours with the Illinois State Police troopers, and he had sent for them because they were more experienced in homicide matters. And they sat down, a group of them, and the ISP officers were given everything, which is two dozen marred photos, horrible photos, every note they took, the information from both medical examiners, and there's a question, did you discuss search warrants while he was in your custody? And the answer either from Kettlinger or the former chief of police was, we don't really recall because we didn't take any notes of this one, the March 5th meeting. The only one, there are no real notes. So is that a coincidence going into March 6th? I don't. On March 6th, we all know there were no notes. As a matter of common sense, as well as U.S. Supreme Court, and as a matter of fact, the recent second district appellate decision, notes are very important, extremely important, and the absence or the failure to turn them over can be fundamental and reversible. Now here the state's only reason for not contacting or calling as a witness former ISP Master Sergeant Peter Zeman, Z-E-M-A-N, was because he was retired. Well, I don't know if I can talk about the Internet or anything else, but I'll just throw this out. Retired, you might want to go online and find him because he's teaching concealed weapons in Vermont, Illinois. We can't do that. It's not inevitable. But the point is the state has the responsibility of calling those witnesses who are important in the confession setting. Would the judge find that necessary? It's not reversible or not to, but it's a consideration today. They never called former ISP Zeman, and the only thing in the record is he's retired. Well, okay, so is the former chief of the South Barrington Police Department. He was retired, but he testified. So I'll go backwards. Credibility? Please. If the court rejected the state's testimony, not in its entirety, because for reasons that I can't explain, the court declined to suppress some of the April 24, 2013, videotaped and audio interrogation of defendant after they got an arrest warrant with no bail. They pick him up after following him around for a couple of days. They pick him up without telling him they have an arrest warrant, no bail. Buddy, you're in custody. You can't leave. They ask him if he'd care to come and chat again about his wife's demise 13 years earlier. And he, being the functional equivalent of a simple soul who believes the police are there to help, goes with them. And sure enough, they keep him there until 2 o'clock. And when he finally, out of frustration and desperation, and this is part of the court's 30-page decision, insists that he have a lawyer, they say, Well, by the way, we have an arrest warrant. You're in custody for murder, and have a good day, sir. So I ask this court, and this court may consider those facts, because you are asking, we are asking, that you affirm the judgment alone, even though we don't agree with that part of it. This court may consider those parts that even we don't agree with, and that's from an Illinois Supreme Court decision called People v. Latitia Johnson, and I believe it was written by Justice Freeman. So the point is that we are not hampered by the fact that he disregarded some of what we wanted, but by the same token, the court's rejection of that clearly shows that the circuit court was aware of all the facts. And even though he disagreed with us, he agreed with the state on that part of it. So the state is in a no-win position here, because the court in part embraced what the state wanted, and in part rejected it. So they do not appeal anything to do with the partial suppression of the April 24, 2013, and you might ask, why? Well, they don't want this court to get into those facts, and you'll notice very little was said about it by the state. And the state doesn't tell you that on March 3rd or 4th, they put out a mail cover for the defendant. They never mention that. And on March 5th, they don't get into the details that happened during the hearing. And on March 6th, they would poo-poo the notion that showing somebody morgue photos of your deceased wife is part of a conversation, not an interrogation. The interrogation was a two-step interrogation. Just directly out of People v. Lopez, People v. Alfaro, People v. Montgomery, where they talked to this man for three hours, two and a half hours. They went over every part of what he recalled from 228. They found two inconsistencies, and that's when they gave him Miranda warnings and went over the whole thing again. You had a continuity of officers, time, place, subject matter. That's what you have. The mood, if there was a mood in the first place, changed from congenial and conversational to confrontational and accusatory. And there's no disputing that, according to the circuit court judge. So the state can label it what they want, but great deference should be shown the circuit court judge's findings. Finally, the fact that it's uncontroverted and the state talks about this, the defendant didn't testify.  And there's a slew of cases, including current ones from this district, People v. Washington, People v. Ali, which we cite in our brief. The defendant didn't testify, and nonetheless, the court, on appeal, either affirmed the circuit court or found in favor of the defendant. We ask that you affirm the judgment below. Thank you. Thank you. Ms. London? May it please the Court again? I'll be brief. With regard to the defendant's argument that a question first, warn later tactic was utilized here, that was argued below, and the trial court, in fact, did not agree and didn't make that part of his findings. The people would maintain that there's absolutely no evidence, objective or subjective, that a deliberateness on the part of the officers to utilize a question first, warn later technique happened here. In this case, as soon as the defendant made inconsistent statements, the officers read the defendant his Miranda rights. Unlike Lopez and Siebert, in Siebert they actually admitted doing an intentional technique of question first, warn later, but in Lopez and Alferez, those situations are completely different. The interview which occurred in those cases were such to get a confession from those defendants, and then once a confession was obtained, to give Miranda warnings. That did not happen here. In fact, we don't have a confession in this case. But what we do have is the minute that the defendant made inconsistent statements, that is when he was given his Miranda rights, he said he understood, and he waived his rights. Why did they bring in experts in murder cases to do this if they weren't trying to get a confession? Truth be to your honors, this drowning, this murder occurred in South Barrington. They don't have violent crimes there. They didn't know how to handle it. They needed assistance, and they needed assistance from the Illinois State Police Department. And then they met the day before. They met to come up with a strategy. Well, certainly it's a police investigation. It would have been terrible police work had they not informed the officers of what the details of the case were. That does not make this an illegal seizure or detention. You don't think they wanted to try to get him to confess in the morning? I mean, that was part of their intent? Absolutely not. Because if you look at the nature of the interview that occurred in the morning, it was more of a background interview. What happened on Sunday, more about the background of the victim, her health conditions, some talk about their marital status. And then when he made inconsistent statements about how he found his wife's body in the tub and other inconsistent statements regarding their marital status, that is when the defendant was Mirandized. It was a long time after that that the defendant made any incriminating statements. And even farther into the interview at 625 when he voluntarily signed the consent to search his home. So this absolutely was not a circumstance where there was deliberate action by the officers to utilize a question first, warn later approach. There's absolutely no evidence of that. Counsel, you're suggesting they were not trying to get a confession from this man? I am suggesting, Your Honor, that they were trying to obtain information. Why couldn't they do that at his house? Why did they have to bring him to the station? Why couldn't they have a conversation at his house? They were just trying to get information. They possibly could have. However, many cases hold that simply because an interview occurs at the police station does not transform a voluntary accompaniment to the station into an illegal detention. And, in fact, driving a... The only thing I'm trying to suggest, Counsel, is for you to come in here and tell us they were not trying to get a confession. They were just holding a conversation. If that's all they were doing, that could have been done at his house. It doesn't make what happened here something illegal in the violation of the defendant's constitutional rights such that the evidence should have been suppressed. Absolutely not. Whether or not they could have done it at the house or not, the defendant agreed to the location, to the mode of transportation. I agree that it was voluntary. I'm simply saying that they weren't trying to obtain a confession or get information from this man so they could indict him. And whether they were trying to get information... But he voluntarily went to the station. He voluntarily did. And, in fact, my opponent talks about him being a poor soul. We're talking a simple soul. What we're really talking about here at that time is a 51-year-old man who was a highly educated chemical engineer. And, in fact, he knew full well what he could have done because the next day he came back and said, I do not want to speak to you anymore without an attorney. And, in fact, we have evidence that on March 7th, after leaving the station, he hired an attorney. So this is not a simple uneducated young juvenile who was taken to the station, taken from his home, and brought for questioning. This is a gentleman who was called the day before, agreed to an interview, agreed to the location, agreed to the mode of transportation, never asked to end the interview. This was voluntary. And everything that was obtained from that point, from what happened during the interview at Hoffman States, was legal. It did not violate his constitutional rights. Counsel, can we agree that even very highly educated people do stupid things? Yes, they possibly murder their wives. So, yes, but that doesn't mean that this was a defendant who didn't know what his rights were, didn't know what he was doing, and that his appearance at the station was not, it was voluntary, he remained at the station voluntarily until he went home at the end of the day. We would maintain that the trial court was completely incorrect in granting the defendant's motion to suppress. I have one more point which I wish to make. The defendant talks about that we could have called Agent Zima, what I wish to have this court understand is, yes, we could have, but this was defendant's motion, and under a Fourth Amendment it would have been his burden. He also could have called Agent Zima and chose not to. We presented Agent Tenza, and she testified to the details of the interview, which the court did not find unreliable and improbable because she didn't take notes. There's no statute, no requirement that she needed to take notes. She testified truthfully. For the reasons made here today and those made in our briefs, we would ask this court respectfully to reverse the trial court's finding, granting defendant's motion to suppress and remand this case for further proceeding. Thank you so much. Thank you. The court would like to thank the attorneys for their fine briefing and argument on this matter. This matter will be taken under consideration. We'll stand adjourned.